# Richmond

CLIFTON B. ROGERS V. BENJAMIN HARRISON RUNYON, ET AL.

April 25, 1960.

Record No. 5065.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Charles Pickett* (*Pickett, Keith & Mackall*, on brief), for the appellant.

*Leonard L. Lonas, Jr.* and *William H. Hansbarger* (*Gibson, Hix, Millsap & Hansbarger*, on brief), for the appellees.

SNEAD, J., delivered the opinion of the court.

This appeal resulted from the entry of a decree on March 21, 1959, dismissing Clifton B. Rogers' amended bill of complaint exhibited against Benjamin Harrison Runyon and Lillie T. Runyon, his wife; E. P. Robertson and Mamie R. Robertson, his wife, and H. Selwyn Smith, substituted trustee under a deed of trust in which Rogers was grantor. The object of the bill was, among other things, to have declared void and set aside a deed executed by Smith, substituted trustee, dated October 8, 1955, which conveyed to the Runyons approximately 158 acres of land situated in Prince William county, and also a deed of trust of even date given on the property by the Runyons to Smith, trustee, to secure the balance of $21,000 on the purchase price. Complainant also prayed that the Robertsons, beneficiaries under the trust deed, be enjoined from negotiating the note secured thereunder; that he be permitted to pay the arrearage on his obligation in accordance with an agreement he had with Robertson and Smith prior to the foreclosure sale, and that he be restored to the possession of the property.

It was alleged in the amended bill that the sale of the land and the conveyance of it by Smith, substituted trustee, were null and void because the land was not sold in accordance with the advertisement,

complainant was not in arrears, and because Runyon was guilty of fraud upon complainant's rights by entering into a secret agreement with Smith and the Robertsons to extend him (Runyon) credit in violation of the terms of the advertisement.

The evidence was heard *ore tenus* on February 11, 1959. Under the well established rule the chancellor's judgment on conflicting evidence carries the same weight as that of a jury, and it will not be disturbed unless it is plainly wrong or without evidence to support it. *Williamson* v. *Johnson,* 164 Va. 632, 637, 180 S. E. 310; *Smith* v. *Pippin,* 188 Va. 869, 876, 51 S. E. 2d 159. The court's decree has resolved all such conflicts in favor of defendants, and we must view the evidence in the light most favorable to them.

On April 19, 1950, Rogers purchased from the Robertsons the land in question and certain personal property for $40,000 for which $8,000 was paid in cash and the balance of $32,000 was secured by a purchase money deed of trust, payable in monthly installments of $50 and interest at the rate of 5 per cent per annum. J. Jenkyn Davies and H. Thornton Davies were named trustees under the deed of trust. In November 1950, Robertson loaned Rogers $1,500, evidenced by a note, which was secured by a second deed of trust on the property.

Rogers encountered difficulty in making payments on the notes and he was considerably in default in June 1955, when the Robertsons consulted Smith, an attorney, who was administrator of the estate of H. Thornton Davies, deceased, one of the trustees, with respect to foreclosure proceedings. Smith in his capacity as administrator of Davies' estate advertised the property for sale for cash at public auction to be held on July 16, 1955. Luke M. Polland purchased the property for $33,000, and in accordance with the terms of the sale a 10 per cent deposit amounting to $3,300 was made at the time.

Shortly thereafter Polland assigned his rights to Runyon, who reimbursed him for the deposit made. Runyon arranged with Robertson for a loan of $21,000 to be secured by a first deed of trust on the property. He delivered a check for $8,700 to Smith who prepared the note dated July 27, 1955, and a deed of trust securing its payment which were executed by the Runyons who took possession of the property and have remained there ever since. Later the validity of the sale was questioned because the surviving trustee, J. Jenkyn Davies, had not made the sale. It is conceded that the sale

was void. As a consequence Smith cancelled the note, drew a check for $3,300 payable to Runyon, endorsed Runyon's check for $8,700 back to him and transmitted the instruments to him. Whereupon Runyon returned them to Smith and said: "You keep them in your file so if I am successful at the next sale you will have them, and if I am not successful you can give them to me at that time." Davies resigned as surviving trustee and Smith was appointed substituted trustee. The property was again advertised by him for sale, for cash, to be held on October 8, 1955.

Among those present at the sale were Runyon, Robertson, Rogers, E. R. Connor, who appeared in the interest of Rogers, and Christ Latsios, holder of a third deed of trust note for $5,000. The property was sold to the Runyons, the highest bidders, for $33,000. Settlement was made by a cash payment of $12,000 and a note for $21,000, dated October 8, 1955, executed by Runyon and his wife, secured by a deed of trust of the same date on the property, which was subsequently paid. Although Connor said the property is worth considerably more now, he thought it was sold "for what it was worth at the time." Later he testified a fair value was $40,600, yet he stated his bid was not over $32,000.

The assignments of error are as follows:

"1. The Court erred in dismissing complainant's bill of complaint.

"2. The final decree of the Court dismissing the complainant's bill is contrary to the law and the evidence.

"3. The final decree of the Court in dismissing the complainant's bill is without evidence to support it."

The first question posed by complainant is whether a trustee can advertise property for sale on the terms of all cash and pursuant to a prior agreement with the successful bidder, extend him credit. The evidence shows that Robertson did agree to extend partial credit to the Runyons, to whom Polland, the purchaser, had assigned his rights about a week after the first sale held on July 16, 1955, which was prior to the time it was determined that the sale was void. Since the sale was void, the agreement was of no effect. The evidence establishes that there was no such agreement made thereafter until the Runyons had purchased the property at the second sale on October 8, 1955. Robertson testified:

"Q. Now, was it after the second sale that you agreed with Mr. and Mrs. Runyon that you would extend them credit to the extent of $21,000?

"A. That was after the second sale.

"Q. You hadn't agreed to that before the second sale?

"A. No."

Runyon was asked: "After the first sale but prior to the second sale, other than the occasion that you mentioned with Mr. Polland and Mr. Robertson being agreeable to lend you $21,000, [before the first sale was declared void] did you ever enter into any agreement with Mr. Robertson relative to extending you credit if you bought it at the second sale?" His reply was: "No, never mentioned it." He also said he had no such agreement with Smith, substituted trustee. This fact was corroborated by Smith's testimony. Thus we see there was sufficient evidence for the chancellor to hold that such an agreement did not exist prior to sale, and the question of law presented is not involved here.

The next question, as stated by the appellant, is "whether a trustee who has received a tender of the arrears due under a deed of trust acceptable to the beneficiary thereunder may arbitrarily refuse to accept said tender and proceed to declare a default and advertise and sell the property." The evidence accepted by the chancellor does not show that the trustee refused to accept a valid tender. Robertson testified that Rogers approached him before the first sale and asked him if he paid "all the back interest and *everything* up to date" would he "still let him go on with the place" to which he agreed; that he and Rogers went to Smith's office and he thought the figure arrived at was $2,500 and a note for $500 payable to Smith for his "fee" and that the sale would be called off if Rogers presented payment within an hour before the sale. Later he was asked: "All you wanted was to get the back payments cleared up, isn't that right?" He answered: "Correct." He further testified Smith did not inform him that Rogers had tendered a cashier's check for $2,500 the day before the sale. (Italics supplied.)

Rogers said that at the conference he gave Smith his records and Smith told him "the best he could figure" $2,500 covered everything due Robertson, including grass seed, taxes, insurance, delinquent installments on the first deed of trust and the second deed of trust note in full; that he suggested to Smith if he did not conduct the sale he would pay him $500 as his "fee" to be paid at the rate of $50 per month on any balance not covered in the $2,500; that the arrangement was agreeable to the Robertsons, and that when he asked Smith how long he would have to raise the money, he replied:

"So long as you have it there, if it is five minutes of twelve as of the day of sale there won't be any sale." He was asked on cross-examination if the figure was not $2,593.28 and he said he had never heard of that figure.

Smith stated according to his notes the understanding was that $2,593.28 was to be paid on or before July 14, 1955, two days before the sale; that it was provided in the agreement that he would receive as his commission $300 cash, and if it not all cash, then the sum of $100 cash and a note for $400 payable 6 months after date; that William W. May, Rogers attorney, called at his office and stated he had a cashier's check for $2,500, which he turned down "simply and purely because our offer was $2,593 by a specific date, and he had not met the requirements." He said: "The offer had been made by the beneficiary of the note and not by me and I did not have the authority to vary the terms of that offer." He further testified Robertson had knowledge before the sale that the tender had been made.

On the morning of the sale Smith was informed that a bill had been prepared asking that the sale be enjoined, in which he and the Robertsons were named party defendants. After hearing argument the court denied the injunction. The bill signed and sworn to by Rogers stated that the agreement provided that $2,593.28 was to be paid on or before July 14, 1955, and that $2,500 was tendered on July 15, 1955. Certainly this evidence supports Smith's testimony that the requirements of the agreement had not been met by Rogers. The record shows no tender was made to either Smith or Robertson after the void sale, which would have been agreeable to the beneficiaries if in the proper amount. We find that Rogers did not make a tender in accordance with the agreement, and that he was in default at the time of both the first and second sales which justified a foreclosure.

Rogers argues that a trustee, contrary to the wishes of the beneficiary, may not lawfully advertise a sale for all cash instead of on terms. But the evidence shows the property was advertised for sale in accordance with the wishes of the beneficiaries, and consequently the question of law is not involved. Robertson was questioned:

"Q. Did you have any discussion with Mr. Smith as to what the terms of the sale would be, whether it would be all cash or credit?

"A. I told him on the first sale I wanted all cash.

\* \* \* \* \* \* \*

"Q. Didn't you want to sell it for all cash at the second sale?

"A. Well, I wanted cash in the first sale and I didn't make any change in the second."

The question is also raised as to whether Smith, substituted trustee, was requested by the beneficiaries to advertise the property for sale. According to Robertson, Smith advised him that "the deal didn't go through" and that "we will have to sell it over again." He was asked: "Did you authorize him [Smith] or request him to sell it over again?" His reply was: "I just took it for granted. He was my attorney and I left it up to him." Smith testified that Robertson employed him to proceed to foreclose, or collect if he could prior to foreclosure the several obligations due him by Rogers. Moreover, Robertson attended the sale, acquiesced in it and has never registered an objection to it. Although Robertson did not actually request Smith to conduct the second sale, it is clear his actions were tantamount to such a request.

The deed of trust under which the foreclosure sale was had provided: "This deed of trust is made and executed in and under Sections 55-59 and 55-60 of the 1950 Code of Virginia, * * *."

Section 55-59, 1959 Replacement Vol. 8, Code 1950, reads in part:

"Every deed of trust to secure debts or indemnify sureties, except so far as may be therein otherwise provided, shall be construed to impose and confer upon the parties thereto, and the beneficiaries thereunder, the following duties, rights and obligations in like manner as if the same were expressly provided for by such deed of trust, namely:

\*        \*        \*        \*        \*        \*        \*

"(6) In the event of default in the payment of the debt secured, or any part thereof, at maturity, or in the payment of interest when due, or of the breach of any of the covenants entered into or imposed upon the grantor, then at the request of any beneficiary the trustee shall forthwith declare all the debts and obligations secured by the deed of trust at once due and payable and shall take possession of the property and proceed to sell the same at auction at the premises or at such other place as the trustee may select *upon such terms and conditions as the trustee may deem best,* after first advertising the time, place and terms of sale in such manner as the deed may provide, or, if none be provided, after first advertising the time, place and terms of sale once a week for four successive weeks in a newspaper published or having general circulation in the county or city in

which the property or some portion thereof is located, it not being intended, however, to declare that other and different advertisement may not in any case be deemed reasonable, nor to prevent the trustee from giving the sale such additional advertisement as he deems advisable. No notice to the grantor or his successor in title shall be required unless required by the deed of trust." (Italics supplied.)

The deed of trust did not provide for the time, place and terms of sale. Rogers contends the trustee abused his discretion by advertising the property for sale for all cash, and appellees take the position had he not done so he would have abused it. We have found that the advertised sale in question was in accordance with the wishes of the beneficiaries. By advertising the sale for cash instead of on terms the Robertsons were in a position to decide whether the successful bidder was a good risk for the extension of credit and forestall a repetition of a foreclosure they experienced with Rogers. There was competitive bidding and Rogers was not harmed by the sale being conducted on such terms. We find that the trustee did not abuse his discretion by advertising the sale for cash.

Our conclusion is the trial court did not err in entering the decree appealed from, and it is therefore

*Affirmed.*